1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| UNITED STATES OF AMERICA, | CASE NO. 3:23-cr-05144-DGE-1 |
|---|---|
| Plaintiff, | ORDER GRANTING MOTION TO CONDUCT EVIDENTIARY HEARING PURSUANT TO *FRANKS V. DELAWARE* (DKT. NO. 74) |
| v. | |
| BRYANT KEITH MCCULLOUGH, | |
| Defendant. | |

Defendant Bryant McCullough was indicted on one count of production of child pornography. (Dkt. No. 14.) McCullough moves to suppress the evidence the government collected from his digital devices. (Dkt. No. 74.) This order focuses exclusively on McCullough's request for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). As explained below, because of the investigating detective's omission of information regarding the contents of a video that potentially formed the basis for probable cause to search McCullough's electronic devices, the Court GRANTS McCullough's request for a *Franks* hearing, and defers otherwise ruling on the motion to suppress until after that hearing.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## I     BACKGROUND

On March 10, 2023, a Washington State Superior Court judge issued a search warrant permitting law enforcement to search McCullough's residence and person.  (Dkt. No. 74 at 30–34.)  The warrant authorized law enforcement to search and seize any digital devices that might contain evidence of multiple child exploitation offenses, including possession of depictions of minors engaged in sexually explicit conduct, child molestation, sexual exploitation of a minor, and distribution to minors.  (*Id.* at 31–32.)  Tacoma Police Department Detective Jimmy Welsh submitted a 41-page sworn affidavit in support of an application for a search warrant, which relayed the following facts.  (*Id.* at 36–76.)

On February 16, 2023, Officer Dominic Nakano interviewed Chelsea Wilson.  (Dkt. No. 74 at 63.)  Wilson stated she was involved in her local motocross community and had received a Snapchat picture from a parent group chat that raised "immense concern."  (*Id.*)  Wilson stated the photograph, which she believed was sent to an unknown minor in the community approximately a year prior, was of McCullough, with "sexually explicit language affixed to the picture."  (*Id.* at 63–64.)  The photograph showed McCullough's face and included the following text: "I'm gonna suck your giant dick and then when you're the most hard I'm going to finish you off inside me.  Then I'm gonna bend you over and finger your butt until your nice and loose and then I'm gonna stick my big dick inside of you until you can't take it anymo."  (*Id.* at 64.)  Wilson expressed concern that McCullough had "come into the local motocross community out of nowhere with no known background in motocross."  (*Id.*)  She reported that McCullough sponsored many of the children in the motocross community by paying for and taking them to races and had been known to take the minors to races by himself and stay in hotels with them alone.  (*Id.*)

Detective Welsh interviewed Wilson a couple of weeks later and learned that Wilson was not directly involved in the incident but was acting "as a point of contact for the motocross community." (*Id.*) Wilson reiterated what she had previously told Officer Nakano, and added she learned that McCullough was purchasing the juvenile riders "Ethika" underwear, an expensive brand of motocross underwear. (*Id.* at 65.) Wilson reported that another community member had confronted McCullough regarding the Snapchat picture, and McCullough responded that it was a joke and a misunderstanding. (*Id.*) Wilson advised that MV1 had originally received the photograph from McCullough. (*Id.*)

On February 27, 2023, Detective Welsh contacted MV1, who confirmed he was the original recipient of the photograph. (*Id.*) MV1 stated he had met McCullough from the motocross racing community and had communicated with him on Snapchat numerous times regularly before McCullough sent the photograph. (*Id.* at 66.) MV1 provided a second photograph to Detective Welsh, which showed McCullough's face and a message box with a chat that read, " Did u take a ss of that shit or sum.' " (*Id.*) Detective Welsh explained that through his training and experience, he learned "ss" is shorthand for "snapshot." (*Id.*)

On March 8, 2023, Detective Welsh received a call from the mother of MV2 and MV4, two minors who McCullough sponsored. (*Id.*) She reported that MV2 had disclosed that McCullough had touched his penis while he slept at McCullough's apartment. (*Id.* at 67.) At the time of the incident, McCullough and MV2 were sharing a bed and were the only ones in the apartment. (*Id.*)

Detective Welsh researched McCullough using investigative databases and located a 2021 police report regarding McCullough "being in possession of depictions of minors engaged in sexually explicit conduct." (*Id.* at 67–68.) The report stated that on November 29, 2021, the

1    mother of a 17-year-old girl reported to the Tacoma police that MV3 had recorded a sexual

2    encounter with her daughter ("the Video") without her knowledge or consent, and "shared the

3    video with his Moto-cross coach [McCullough], who is an adult. [McCullough] then shared the

4    video through a group Snapchat to several people." (*Id.* at 68.) The 17-year-old had not

5    personally seen the Video, but knew it was being shared. (*Id.*)

6        On March 9, 2023, Detective Welsh interviewed MV3 regarding the Video. (*Id.* at 68–

7    69.) The affidavit stated,

> MV3 later described that [the 17-year-old] picked him up in her car and they went
> to an elementary school. MV3 stated that he and [the 17-year-old] had sexual
> intercourse inside of her vehicle. MV3 stated that he took the video with his
> cellular phone, while holding it from his chest height directed down at their
> genitalia. MV3 confirmed that the video focused on the sexual act, although he
> was not confident on the quality of the video. MV3 stated that the video was
> several seconds long.

12   (*Id.* at 69.) MV3 stated he sent the Video to McCullough via Snapchat and could not remember

13   the conversation that preceded or followed MV3 sending the Video. (*Id.*) MV3 stated that

14   McCullough did not "necessarily ask for it," and explained he thought McCullough would think

15   he was cool if MV3 send it. (*Id.*) After sending the Video, a message appeared on Snapchat

16   informing MV3 that McCullough had downloaded the Video to his camera roll. (*Id.*) MV3 was

17   later sent the Video by his friend, who admitted to receiving the Video from McCullough. (*Id.*)

18       On March 10, 2023, Detective Welsh interviewed MV5 and MV6. (*Id.* at 71.) MV5

19   stated McCullough had previously asked him for "pictures of him wearing the 'tighty-whities'

20   [McCullough had gifted him]." (*Id.*) MV6 stated McCullough had asked him for a picture of his

21   penis in exchange for a "care package" which MV6 took to mean Ethika underwear. (*Id.* at 71–

22   72)

23

24

ORDER GRANTING MOTION TO CONDUCT EVIDENTIARY HEARING PURSUANT TO FRANKS V.
DELAWARE (DKT. NO. 74) - 4

1    A judge thereupon issued a search warrant based on the forgoing facts.  (Dkt. No. 74 at

2   31–76.)  Law enforcement executed the search warrant on March 10, 2023 and seized several

3   digital devices, including a GoPro camera, laptop, multiple digital media storage devices, a cell

4   phone, and film cameras.  (Dkt. No. 1 at 4.)

5                    II        STANDARD OF REVIEW

6           The United States Supreme Court established a two-prong test for overturning a judicial

7   officer's probable cause finding.  Because there is a "presumption of validity with respect to the

8   affidavit supporting the search warrant," a defendant is entitled to an evidentiary hearing on the

9   validity of the affidavit only if they can make a "substantial showing" that: (1) the affidavit

10  contains intentionally or recklessly false statements or misleading omissions and (2) the affidavit

11  cannot support a finding of probable cause without the false information or with the misleading

12  omissions.  *Franks*, 438 U.S at 171–172.  The Ninth Circuit has articulated five requirements

13  that a defendant must satisfy to warrant a *Franks* hearing: "(1) the defendant must allege

14  specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant

15  must contend that the false statements or omissions were deliberately or recklessly made; (3) a

16  detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of

17  only the affiant must be challenged; (5) the challenged statements must be necessary to find

18  probable cause."  *United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986) (quoting *United*

19  *States v. Dicesare*, 765 F.2d 890, 894–95 (9th Cir. 1985)).

20          In other words, a defendant must show that the affidavit could not support a finding of

21  probable cause even if it were purged of its falsities and/or supplemented by its omissions.  *See*

22  *United States v Stanert*, 762 F.2d 775, 780–81 (9th Cir. 1985), *amended*, 769 F.2d 1410 (9th Cir.

23  1985).  "The use of deliberately falsified information is not the only way by which police

24

ORDER GRANTING MOTION TO CONDUCT EVIDENTIARY HEARING PURSUANT TO FRANKS V.
DELAWARE (DKT. NO. 74) - 5

1   officers can mislead a magistrate when making a probable cause determination." *Id.* at 781.  "By

2   reporting less than the total story, an affiant can manipulate the inferences a magistrate will

3   draw." *Id.*

### III    ANALYSIS

5       McCullough requests a *Franks* hearing because he argues the affidavit supporting the

6   warrant to search his house and electronic devices contained numerous material omissions and

7   false statements that negate its showing of probable cause.  The Court addresses each in turn.

### A. MV1

9       McCullough argues that Detective Welsh misled the judge into believing that MV1 was a

10  cooperating witness and further lied about MV1's acknowledgement that he was the original

11  recipient of the photograph from McCullough.  (Dkt. No. 75 at 11.)  McCullough points to

12  Detective Welsh's February 28 interview with Wilson, where Detective Welsh stated "[MV1]

13  was very clear with me, not only does he not want to cooperate with the investigation, nothing

14  happened to him, and he's big enough to take care of himself."  (Dkt. No. 65, Exh. 2A at 19.)

15  Firstly, the affidavit does not give the appearance that MV1 is a cooperating witness, and

16  Detective Welsh was under no obligation to report that MV1 did not want to participate further.

17  The relevant information was included in the affidavit—that MV1 received the Snapchat

18  photograph from McCullough.  Second, McCullough makes the conclusory argument that the

19  absence of MV1's recorded statement means the statement did not occur.  (Dkt. No. 74 at 13.)

20  Additionally, MV1's statement that he was not the victim of sexual abuse does not equate to him

21  not having received the Snapchat photograph from McCullough.  The Court finds these were not

22  misrepresentations or omissions.

23

24

1

**B.  Chelsea Wilson**

2    McCullough argues that Detective Welsh misled the judge into believing that Wilson

3   received the Snapchat photograph from the source in real time.  (Dkt. No. 74 at 13.)  The Court

4   disagrees with this assertion.  In the search warrant application, Detective Welsh quoted

5   Wilson's interview with his colleague, which noted that the "picture had been sent approximately

6   one year ago but has just now been brought to her attention in the group chat."  (*Id.* at 64.)

7    McCullough further argues Wilson provided conflicting versions of events to Detective

8   Welsh and his colleague.  (Dkt. No. 75 at 23–24.)  The report of Wilson's February 16 interview

9   stated that Wilson "advised that she confronted [McCullough] about the original image and he

10   replied, 'It was entirely a joke!' "  (Dkt. No. 62-2 at 6.)  In her February 28 interview with

11   Detective Welsh, Wilson stated that "another community member" "confronted [McCullough]

12   regarding the inappropriate message," and McCullough told this community member "that the

13   message was a joke and a misunderstanding."  (Dkt. No. 74 at 65.)  However, transcripts of both

14   interviews show that Wilson remained consistent in her recitation—it was another individual

15   who confronted McCullough about the photograph, not Wilson.  (*See* Dkt. No. 65, Exhs. 1A at 4,

16   2A at 9.)  Thus, neither of these constitute false statements or misrepresentations.

17   **C.  Boilerplate Language**

18    McCullough argues that Detective Welsh made misrepresentations regarding the use of a

19   laptop, desktop computer, and cell phone in this case, and his use of "boilerplate language"

20   "falsely led the reviewing [judge] to conclude" this fortified his request for probable cause.

21   (Dkt. No. 75 at 12, 19.)  McCullough further contends that Detective Welsh's statements

22   regarding cell phone and biometric access are misleading "as other Courts have also found there

23   are other ways which the government might access the content that do not trample on Fifth

24

1    Amendment protections." (*Id.* at 29.)  McCullough fails to show how this "boilerplate language"

2    was a falsity or misrepresentation.

3    **D.  MV5 & MV6**

4    McCullough argues that Detective Welsh misrepresented that he received critical

5    information from MV5, when he instead received the information from MV5's mother.  (Dkt.

6    No. 75 at 22.)  The Court acknowledges that the affidavit is potentially ambiguous.  The affidavit

7    identifies that Detective Welsh spoke with the mother of MV5 (a/k/a A.M.) on March 9, 2023 at

8    1916 hours.  (Dkt. 74 at 70.)  The mother describes to Detective Welsh the conversation she had

9    with MV5, which arguably, Detective Welsh continues to describe.  (*Id.* at 70–71.)  It is unclear

10   whether Detective Welsh first spoke with MV5's mother, and then spoke with MV5 directly, as

11   MV5 referenced during his interview that he spoke with Detective Welsh "last night."  (*See* Dkt.

12   No. 65, Exh. 4A at 20.)  Even if the Court assumes without deciding there is some type of

13   misrepresentation regarding who relayed the information, Detective Welsh interviewed MV5 on

14   March 10, 2023 around 8:00 a.m., during which MV5 provided the same information.  (Dkt.

15   Nos. 65, Exhs. 4, 4A; 74 at 71.)  Detective Welsh applied for the search warrant after the

16   interview.  (Dkt. No. 74 at 71.)

17   McCullough further argues that Detective Welsh failed to provide the reviewing judge

18   with text messages he received from MV5's mother that showed McCullough soliciting MV6 for

19   sexually explicit images.  (Dkt. No. 75 at 23.)  Again, Detective Welsh interviewed MV6, who

20   confirmed he received messages from McCullough requesting photographs of his genitalia in

21   exchange for a "care package."  (Dkt. No. 65, Exh. 4A at 26–27.)  The text messages themselves

22   were not necessary.

23

24

1    **E. MV3**

2    McCullough argues Detective Welsh omitted key information pertaining to MV3's

3    recitation of the Video's contents. (Dkt. No. 75 at 4–5.) Specifically, McCullough argues

4    Detective Welsh failed to state in his affidavit that MV3 told him "14 times no sexual act was

5    visible in the subject video," "nothing could be seen," and the video had been deleted 17 months

6    prior. (*Id.* at 5–6.)

7    The government provided both the recording and transcript of Detective Welsh's

8    interview with MV3. (*See* Dkt. No. 65.) In the interview, MV3 stated he sent McCullough the

9    Video on Snapchat because he "probably thought it was cool. And then, um, after that,

10    [McCullough] sent it to another one of [MV3's] friends." (Dkt. No. 65, Exh. 3A at 10–11.)

11    MV3's friend sent MV3 the Video and said he received it from McCullough. (*Id.* at 12–13.)

12    When asked how McCullough responded when he was sent the Video, MV3 stated "I think he

13    just saved it." (*Id.* at 14.) MV3 confirmed he knew McCullough saved the Video to his camera

14    roll because a function on Snapchat informed him of that. (*Id.* at 14–15.) MV3 stated

15    McCullough did not say MV3 should not be sending the Video to him, and stated, "I'm pretty

16    sure he just responded something like, as a joke. Like he thought it was funny, but I don't

17    remember the chats." (*Id.* at 15.) MV3 described the Video as, "[I]t wasn't that long of a video.

18    It was just this—like a few seconds and it was pitch black. You couldn't even see anything. So

19    I—I just sent it to [McCullough] and that's how people knew it was me. 'Cause uh [MV3's

20    friend] said—told people it was me, but all you could see is maybe the back of a sweatshirt."

21    (*Id.* at 15–16.) Detective Welsh stated that other people had seen the Video and were able to tell

22    who was in it, to which MV3 responded, "[I]f you maybe turned up the brightness all the way."

23    (*Id.* at 16.) MV3 confirmed "you can't see me or anything in the video. You can see the back of

24

ORDER GRANTING MOTION TO CONDUCT EVIDENTIARY HEARING PURSUANT TO FRANKS V.
DELAWARE (DKT. NO. 74) - 9

1    my sweatshirt, maybe. . . [b]ecause she was—she was wearing my sweatshirt." (*Id.*)  MV3

2    denied being able to see any part of their genitalia in the Video but stated the girl's butt was

3    visible. (*Id.* at 16–17.)  MV3 continued, "If you maybe turned up like—if you edited the—like,

4    the video and turned up all the stuff, but I couldn't see anything, looking at it myself." (*Id.* at

5    17.)  MV3 stated the Video was of him "having sex," "you just couldn't really see anything," and

6    you could hear the girl's voice and moans within the three second video. (*Id.* at 18, 42.)  MV3

7    agreed that someone "can obviously tell sex is taking place." (*Id.* at 34.)  MV3 further stated,

8    "[Y]ou can—like, it was my sweatshirt that I always wore.  So, and you could like—you can

9    obviously tell by like this audio that was her, and that it was sexual acts happening.  But I—I just

10   don't remember if I told [McCullough] that it was me having sex with her, or if I just send it."

11   (*Id.* at 52.)  MV3 stated he was "pretty sure" he deleted the Video off his phone. (*Id.* at 49.)

12       Instead of relaying this information in the search warrant affidavit, Detective Welsh

13   summarily stated, "MV3 confirmed that the video focused on the sexual act, although he was not

14   confident on the quality of the video." (Dkt. No. 74 at 69.)  He further expressed his conclusion

15   that McCullough was "in receipt of a video depicting minors engaged in sexually explicit

16   conduct," a phrase that is specifically defined by statute as an element of the crime of dealing in

17   depictions of minor engaged in sexually explicit conduct. (*Id*. at 72.)  Detective Welsh omitted

18   from the affidavit that: (1) MV3 stated numerous times the Video was pitch black and one could

19   not see anything, (2) MV3 denied that either person's genitals were visible, and (3) MV3 stated

20   the Video showed the girl's butt and the back of her sweatshirt only.  Furthermore, Detective

21   Welsh explicitly stated that the Video was "an obscene and illegal media file" and a "child

22   exploitative media file," despite never having seen the Video himself and despite MV3's

23   statements describing the video.  (*Id.* at 69.)

24

ORDER GRANTING MOTION TO CONDUCT EVIDENTIARY HEARING PURSUANT TO FRANKS V.
DELAWARE (DKT. NO. 74) - 10

The government argues that Detective Welsh did not mislead the reviewing judge because MV3 was inconsistent about the Video's content.  (Dkt. No. 62 at 17–18.)  The government contends that "[a]lthough Det. Welsh was ultimately correct that MV3 was not confident about the quality of the video, he concededly could have been more precise." (*Id.* at 18.)  The phrase "could have been more precise" suggests that Detective Welsh could have informed the judge that he "was thus left with no clear answer about what precisely the video showed," or that "neither Det. Welsh nor anyone else had a clear idea what precisely was visible in the video," or even that "MV3's conflicting accounts meant that neither Det. Welsh (nor anyone else for that matter) could say precisely what the video showed." (*Id.* at 6 n.7, 18, 23.)  It is unclear why Detective Walsh determined it unnecessary to be more precise.

The Court finds that Detective Welsh appears to have omitted relevant information from the affidavit that resulted in the misleading impression that the Video was unequivocally child pornography.  By stating that MV3 "was not confident on the quality of the video," Detective Welsh presented a skewed version of events and overstated the incriminating nature of the Video.  (*Id.*)  Thus, the Court concludes McCullough has made a sufficient preliminary showing that Detective Welsh's nondisclosure of MV3's description of the Video caused the affidavit to be misleading, and that this nondisclosure was at least reckless.[1]

The Court has not yet determined whether the warrant would not have been issued if the misleading omissions were added back in.  At this stage, the Court concludes only that McCullough has made a sufficient showing that he is entitled to a *Franks* hearing.  *See United*

---

[1] McCullough argues that Detective Welsh failed to include: (1) MV3 was allegedly concerned about his own criminal liability, (2) Welsh had told MV3 he was not in trouble, (3) the video was over 17 months old, and (4) MV3 allegedly had questions about his rights.  (Dkt. Nos. 74 at 16–17, 75 at 5–6.)  The Court concludes these alleged omissions do not cast doubt on the existence of probable cause.

ORDER GRANTING MOTION TO CONDUCT EVIDENTIARY HEARING PURSUANT TO FRANKS V. DELAWARE (DKT. NO. 74) - 11

*States v. Gonzalez, Inc.*, 412 F.3d 1102, 1111 (9th Cir. 2005), *amended on denial of reh'g*, 437 F.3d 854 (9th Cir. 2006) ("at this stage we simply require the defense to make a substantial showing that supports a finding of intent or recklessness").

Once the *Franks* hearing is conducted and the Court makes formal findings, the Parties will have one last opportunity to argue whether any omitted evidence the Court finds should have been included in the affidavit, together with the remaining information in the affidavit, is sufficient to establish probable cause for issuance of the search warrant.

## IV     CONCLUSION

The Court finds that a *Franks* hearing is necessary.  McCullough has made the requisite showing that the affidavit contained reckless omissions surrounding the content of the Video which may have affected the probable cause determination.  Accordingly, the Court will take the motion to suppress under advisement and GRANT McCullough's request for a *Franks* hearing. The evidentiary hearing is set for November 7, 2025 at 9:30 a.m.

Dated this 31st day of October, 2025.

David G. Estudillo
United States District Judge